Richard G. WENTWORTH, Vultron, Inc., and Transign, Inc., Plaintiffs,

v.

GULTON INDUSTRIES, INC., Defendant.

Civ. A. No. CA–3–80–0785–G.

United States District Court, N.D. Texas, Dallas Division.

Aug. 24, 1982.

**510**

Owen E. Perry, Ernie L. Brooks, Paul J. Ethington, Reising, Ethington, Barnard, Perry & Brooks, Southfield, Mich., David W. Shuford, Richard L. Jackson, Shuford, Jackson & Allen, Dallas, Tex., for plaintiffs.

Roger C. Clapp, Richard, Harris & Medlock, Dallas, Tex., for defendant; Morris Relson, David R. Francescani, Darby & Darby, New York City, of counsel.

## MEMORANDUM OPINION

PATRICK E. HIGGINBOTHAM, District Judge.

This patent infringement suit involves computer-activated electronic visual display systems for motor vehicles. On December 17, 1971, plaintiff Wentworth filed a patent application for a visual display system [1] using a special purpose digital computer to operate a flip-dot display manufactured by Ferranti-Packard Electronics, Inc., a Canadian corporation. The patent was first rejected based on prior art and then approved with amendments.

Defendant Gulton Industries, Inc. ("Gulton"), after experimenting with liquid crystal display arrangements for bus and railway use, became aware in mid-1975 of the flip-dot type of visual display marketed by Ferranti-Packard. In 1976, Gulton's Luminator division produced and installed prototypes of a bus-destination system using a microprocessor to operate the flip-dot system. In 1977, Luminator offered an improved design, called LIDS I ("LIDS") which, in slightly modified form, has been installed in bus systems in various communities.[2] Gulton has not applied for a patent on its display product.

By mid-1978, plaintiff Transign, Inc. ("Transign") began experimenting with electronic bus destination signs. In mid-1979, Transign's parent corporation, Trans-Industries, Inc., purchased Vultron, Inc. ("Vultron"), making it a sister company to Transign. Thereafter, plaintiff Vultron continued to develop an electronic destination sign for marketing by Transign. Transign placed its first prototypes using the Ferranti-Packard flip-dot display system in the field in early 1980 and made its first production shipment in August, 1980. Meanwhile, in January, 1980, Transign learned of the Wentworth patent and obtained a license for $10,000 covering the exclusive rights under the patent for the bus and rail fields. Wentworth retained the patent rights in other fields as well as the right to recover for any infringement occurring before February 1, 1980 in all fields. Wentworth was not aware of either the Transign or the Luminator products until after he sold the patent rights.

On March 4, 1980, Wentworth filed suit against Gulton Industries, Inc.[3] Vultron/Transign were added as parties plaintiff on May 8, 1981.

Plaintiffs argue that claims 1, 6, 8 and 9 of the patent in suit have been infringed by Gulton's LIDS display system.[4] Defendant

---

1. Richard Jekiell and Paul Bergan, associates of Richard Wentworth at Rockwell Corporation, were named as inventors of the patent in suit. They subsequently assigned their rights to Wentworth. Wentworth also seeks to be named a co-inventor. Because of the court's disposition of the case, that issue need not be reached.

2. For purposes of this suit, differences among LIDS I, LIDS II and LIDS III systems will not be treated unless necessary to the context.

3. The original suit also named General Motors, a customer of Gulton, as defendant. Brought in the Eastern District of Michigan, the suit was dismissed as to General Motors and transferred to this court on June 12, 1980 with consent of the parties.

4. Before trial, plaintiffs also maintained that claims 2 and 3 were infringed. They now accept their own expert's opinion that 2 was not. *See* Plaintiffs' Post-trial Brief at 6. At the same time, they drop their assertions regarding claim 3, which is dependent on claim 2. Thus, claims 2, 3, 4, 5 and 7 are conceded to be not infringed.

denies that its LIDS system infringes the patent, arguing that (1) the LIDS system omits essential features of the patented system, to which the patent scope was limited to avoid prior art, and which were argued to the Patent Office as being important to patentability; (2) the LIDS system in essential respects uses substantially different structure, functioning in a substantially different way from that of the patent to achieve substantially different results; and (3) the LIDS system, in any respects similar to the patented system, utilizes only prior art teachings. Defendant further claims that the patent is invalid because (1) the patent is not novel, having been anticipated by the prior art or, in the alternative, (2) any differences from the prior art were obvious to a person of ordinary skill in the field, and the patent claims as the invention only an obvious assemblage of prior art components and features, each of which functions in the same manner as it did in the prior art, and which produces no unexpected or surprising results in combination; and finally, (3) the patent claims only an assemblage of functions and lacks adequate disclosure to enable a person of ordinary skill to produce and operate the patented system, without having to invent ways to accomplish those functions.

■ As the Court of Appeals of the Fifth Circuit has directed, this court considers the validity issue before the infringement issue. "[O]f the two questions, validity has the greater public importance." *Beckman Instruments v. Chemtronics*, 428 F.2d 555 (5th Cir.1970) (quoting *Sinclair & Carroll Co., Inc. v. Interchemical Corp.*, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945)).

A statutory presumption of validity usually attaches to patents approved by the patent office. *See* 35 U.S.C. § 282. The presumption arises because of (1) "The acknowledged experience and expertise of the Patent Office personnel," and (2) "recognition that patent approval is a species of administrative determination supported by evidence." *Parker v. Motorola*, 524 F.2d 518, 521 (5th Cir.1975), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976). Nonetheless,

> when a defendant in an infringement suit attacks the validity of a patent on the ground that it was issued without consideration by or presentation to the Patent Office of pertinent prior art, the reason for the presumption dissipates and the presumption is weakened. [citations omitted]. In these circumstances a court must as a minimum scrutinize the patent claims in suit more closely than when the presumption is at full force.

*Id. See also Cathodic Protection Service v. American Smelting*, 594 F.2d 499, 505 (5th Cir.1979) (presumption "severely weakened" when prior art not cited to Patent Office).

■ The defendant in this case has cited pertinent prior art not presented to the Patent Office, *see* pages 517–525 *infra*, so the presumption of the validity of plaintiffs' patent is weakened and the court must scrutinize the patent in suit closely.[5]

### I. *The Patent in Suit*

The patent in suit is U.S. Patent 3,750,-138 (the '138 patent). It concerns an electronic, programmable sign display system that the patent disclosure suggests is especially adapted for police cars, buses and taxis. It is powered by a standard twelve volt vehicle battery. The vehicle operator, by setting a selector switch, can select any one of a plurality of precomposed messages that are stored within the memory of the system to be displayed on a display unit mounted on the front, rear or sides of the vehicle.

---

**5.** The fifth circuit has suggested that the presumption vanishes when the party attacking the patent demonstrates that the Patent Office failed to consider pertinent prior art. *See Reed Tool Co. v. Dresser Industries, Inc.*, 672 F.2d 523, 526 (5th Cir.1982). Once the presumption is weakened—or vanishes—the challenger of the validity of the patent need no longer bear the heavy burden of establishing invalidity either beyond a reasonable doubt or by clear and convincing evidence. A preponderance of the evidence is sufficient. *See Baumstimler v. Rankin*, 677 F.2d 1061, 1066 & 1068 (5th Cir.1982).

The display system disclosed in the '138 patent includes three basic components shown in Figure 1: a manual control unit 20, a decoder 30, and a display unit 40.

Figures 1 and 2 of the '138 patent, with lines showing the relationship of each, are reproduced below:

PATENTED JUL 31 1973

3.750.138

Fig. 1.

Fig. 2.

**514**

For the display means, the patent suggests using the "flip-disks" or "flip-dots" marketed by Ferranti-Packard Limited. This display system has a board for alphanumeric characters, each character displayed on a module containing seven horizontal rows of five dots each in a $5 \times 7$ array or matrix. Each dot has a black nonreflective side and a colored reflective side. Each also has an associated electromagnetic coil or winding assembly for causing the dot to rotate from a position exposing its reflective side to a position exposing its nonreflective side. The reflective sides of the dots form the desired letters or numerals. In the embodiment disclosed in the '138 patent, pulses are applied to the seven dots in each column, sequentially from left to right until the entire message line is displayed. Magnetism holds the dots in position until an electrical pulse is applied to cause each dot to flip to a position exposing its opposite side. An advantage of this display system is that power is needed only to change the word unit, not to keep it displayed.

As an example, the '138 patent describes a display unit row of twelve elements on which twelve characters would be displayed, one character[6] at a time. That portion of a message which can be shown as a unit on the display board is referred to in the patent as a "word unit." Thus, in the example composed of twelve display elements, a word unit contains twelve alphanumeric characters. A message may consist of more than one word unit. In that case, it is displayed in successive lines. For example, the message CAUTION ALL TRAFFIC MERGE RIGHT would be displayed in three message lines or word units: (1) CAUTION (2) ALL TRAFFIC (3) MERGE RIGHT.

The message selector 20 and the decoder 30 control the messages displayed on the display unit described above. The selector is a multiple position switch, whose setting

produces a set of signals representing the designated number of the message being selected.

The decoder includes: (1) an electronic memory bank, characterized as a preprogrammed read only memory,[7] which stores each word unit in a separate memory location; (2) a logic and memory select circuit, with its own memory device to store the individual addresses of the various word units,[8] which determines which of the stored word units is to be called out and which activates the memory bank location containing that word unit; and (3) a set of circuits, which causes each word unit called out of the memory bank to actuate and set the display to show the characters of the word unit. The latter set of circuits includes a character generator, a column sequencer, a character sequencer, a column input of display, and a row input of display. *See* Figure 2. Finally, the decoder operates with feedback signals: one, line 54, from the character generator to the memory bank, causes a new character to be displayed, and a second, line 56, from the memory bank to the memory select, causes either a new word unit or a new message to be displayed.

The organization of the memory in the patent system is called a "fixed-length record" arrangement because each word unit has a fixed number of characters, equal to the number of display modules. The method of accessing the various units is called direct addressing. The logic and memory select circuit has its own memory device in which it stores individual addresses of the word units. Economy of memory capacity is achieved by storing a dictionary of word units from which messages can be assembled rather than a full repertory of complete messages.

In use, the operator looks up the number designating a desired message and sets the selector to that number. On pushing a

6. A character is a letter, numeral, blank space, punctuation mark or other displayed symbol.

7. In a read-only memory, the data may be entered once and thereafter remains unchanged.

8. This device is sometimes called a look-up table.

"go" button 26, *see* Fig. 1 and 2, page 513, the system determines which ones of the stored word units are to be combined to form the full desired message (e.g., word units Nos. 2, 6 and 9). To do this, the system refers to the memory select circuit 31 to "look up" the address in memory bank 32 of the first word unit (No. 2) needed to compose the selected message. The memory select 31 has output wires 50, one for each word unit memory location in the memory bank 32. In response to the "go" button, the memory select 31 activates one wire 50, corresponding to word unit No. 2. That wire then serves to activate the corresponding memory location for word unit No. 2 in the memory bank. In this way, the system directly addresses the memory bank to derive the chosen word unit. The address of the start of each word unit location in memory is stored by the memory select and is used by the system to seek out the word unit.

The activated location of the memory bank then feeds out in succession the data representing the successive characters (both alphanumeric and blank) of word unit No. 2 to the decoder circuit, to set the display, character by character, one character at a time. The logic 31 plays no part in determining sequencing of characters from any one location; it only serves to choose which location is to activate the display.

In the patent system as described, after each character is fully set in the display, the character generator 33 sends a signal back to the memory bank 32 by wire 54 to direct the memory bank 32 to send out the data for the next character. This action continues until all twelve characters of the first word unit are displayed. This action is independent of the logic 31.

The patent requires that the logic in the patented system be signaled from the memory when the memory location for a word unit being displayed has output all its characters. The look-up table of the memory select must be able to tell when one word unit has been completely displayed, so that the next one can be selected and addressed. At the end of the display of the first word

unit, the memory bank 32 creates a "feedback" signal. The feedback signal goes back to the memory select portion 31 of the system to cause it to look up the address of the memory location of the second word unit of the message (e.g., No. 6) as called for by the setting of the selector, and to seek out that address. It does this by activating another output wire 50 from memory select 31, corresponding to the location of the second desired word unit. This newly activated wire 50 then serves to activate the second location (for word unit No. 6) in the memory bank, causing it to produce the data for the characters of that word unit, one at a time, for display (each in place of the correspondingly positioned character of the first displayed word unit) in the same way as in the case of the first word unit.

This action is repeated for the third word unit (e.g., No. 9) and any additional units until all word units of the desired message have been displayed in sequence. At that point, following the completing of activation of the last alphanumeric or blank character of the last word unit, the system must be able to tell that the last word unit of a full message has been displayed, so as to activate the first word unit of the message to repeat the message. To do this, a second "feedback" signal is produced by the memory bank 32, which goes back to the logic 31 to signal completion of the display of the full message. This signal may cause the entire sequence to be repeated.

The '138 patent summarizes the previous description and outlines the objects of the "invention":

Briefly, the present visual display system includes a display unit for simultaneously displaying the individual characters of a word unit. A selector switch is operative to select any one of a plurality of messages, each message consisting of one or more word units which are separately stored in the memory locations of a memory bank. Logic means responsive to the selector switch sequentially activates individual ones of the memory

locations in accordance with the selected message. Finally, a character generator receives the output of the memory bank and activates the display unit, a character at a time, until the entire word unit appears, whereupon the memory bank signals the logic means to activate the next memory location in accordance with the selected message.

It is therefore an object of the present invention to provide a novel visual display system.

It is a further object of the present invention to provide a mobile message display system for communicating with other vehicles or pedestrians.

It is a still further object of the present invention to provide a visual display system having a significantly large message capacity.

It is another object of the present invention to provide a visual display system including all electronic components which minimizes power and memory requirements.

It is still another object of the present invention to provide a visual display system in which the several words of a given message are displayed sequentially rather than simultaneously.

Another object of the present invention is the provision of a visual display system for displaying any one of a large number of messages in which individual messages may be changed without interfering with the remaining messages.

The plaintiffs' expert witness testified that the essence of the patent in capsule form is "a system which can display multi-line messages of variable lengths" and which encompasses the following components or characteristics: (1) the display (2) a selector means to select messages of two or more lines (3) a directly addressable pre-programmed read only memory to store information (4) logic to recover the information and read it out to the display (5) a multiplex system in which characters are energized sequentially not simultaneously (6) signals to indicate end of line and end of message and (7) a memory system includ-

ing a look-up table. *See* Transcript at 234–36.

## II. *The Patent as Anticipated by Prior Art*

"Because every patent creates a monopoly, Congress has balanced the encouragement of inventions with its devotion to competition, and exacted standards for patent validity that deny patent protection even to some successful and innovative ideas. Consistent with these general precepts, patentability requires that an invention be useful and novel, as defined in 35 U.S.C. §§ 101 and 102, and nonobvious. 35 U.S.C. § 103." *Steelcase Inc. v. Delwood Furniture Co., Inc.,* 578 F.2d 74 (5th Cir.1978), *cert. denied* 440 U.S. 960, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1979). The usefulness of the '138 patent is not at issue but its novelty is denied. Congress addressed the novelty requirement in 35 U.S.C. § 102 (1954):

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent ...

The defense of anticipation relates to this novelty issue in the sense that if anticipated by the prior art, a patent is invalid. The test is strict. "[I]t requires a showing of actual identity in the prior art.... Indeed there is authority that anticipation requires that all material claimed features of a patent be contained in a single prior art patent [citations omitted]." 578 F.2d at 78–79.

As the following discussion demonstrates, no single prior art reference duplicates all the features of the patent. Although the two Tele-Spot signs discussed at pages 19–25 are very similar, neither assembles pre-stored word units from a dictionary of individual word units stored only once to compose a complete message. Rather, only complete messages are stored, and the same word units are stored as many times as they appear in different messages. Therefore, the anticipation de-

fense fails. Nonetheless, the prior art may result in a patent being invalidated as obvious even though novel. *See Continental Oil Co. v. Cole*, 634 F.2d 188, 196 (5th Cir.), *cert. denied*, 454 U.S. 830, 102 S.Ct. 124, 70 L.Ed.2d 106 (1981).

### III. *The Patent as an Obvious Combination of Prior Art*

■ While the defense of anticipation has a conceptual tie to novelty as required of 35 U.S.C. § 102(a), the defense of obviousness relates to the requirement of invention suggested by 35 U.S.C. § 103. That section provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which such subject matter pertains....

The Supreme Court has outlined three factual inquiries necessary under § 103 before a court decides the legal question of patent validity: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the pertinent art. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966). The Court has emphasized that strict observance of these guidelines is necessary. *See Anderson's-Black Rock v. Pavement Salvage Co.*, 396 U.S. 57, 62, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969).

■ Moreover, additional scrutiny is necessary in this case because the patent is a combination patent, acknowledged by the plaintiffs' expert witness to be composed of individual items well-known in late 1971 when the patent was filed.[9] *See* Transcript

at 249. As the Fifth Circuit stressed in *The Robbins Co. v. Dresser Industries Inc.*, 554 F.2d 1289, 1291 (5th Cir.1977):

[W]hen the claimed invention is a combination patent, our task is to "scrutinize [such] claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements.... A patent for a combination which only unites old elements with no change in their respective functions, ... obviously withdraws what already is known in the field into the field of its monopoly and diminishes the resources available to skillful men." (quoting *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 152–53, 71 S.Ct. 127, 130–31, 95 L.Ed. 162 (1950)).

Only when a combination patent produces a "synergistic result," one which is "greater than the sum of the several effects taken separately," is the patent valid. *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258.

### A. *The Scope and Content of the Prior Art*

■ To begin the inquiry demanded by *Graham*, the court considers the scope and content of the prior art. That prior art includes patents, publications and public uses, *Walker on Patents*, § 107, p. 114 (Deller's 2d ed.), and the patent applicant is presumed to know the prior art. The classic image in this area was originated by Judge Giles Rich: "We think the proper way to apply the 103 obviousness test to a case like this is to first picture the inventor as working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him." *In re Winslow*, 365 F.2d 1017, 1020, 53 CCPA 1574 (1966). Thus, in contrast to a patent's novelty, its obviousness can be

---

**9.** The filing date is the relevant date for determining invention because the patent was not reduced to practice before that time. *See Kardulas v. Florida Machine Products Co.*, 438 F.2d 1118, 1120 (5th Cir.1971). "[O]ne obviously cannot be the original inventor if someone else

has described or used the subject matter of the claims before the earliest possible moment to which he can trace his invention." *Beckman Instruments v. Chemtronics*, 428 F.2d 555, 561 (5th Cir.1970).

determined by "the prior art taken as a whole" rather than a single reference, and the court must consider not only the specific teachings of the prior art, "but also the inferences one skilled in the art would draw therefrom." *Parker v. Motorola*, 524 F.2d 518, 532 (5th Cir.1975), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976).

The obvious beginning in this question of obviousness is the Taylor patent issued to Ferranti-Packard, Patent No. 3,303,494, describing the display unit incorporated into the '138 patent. Richard Jekiell, the main inventor, characterized the display system as the key to the patent. Although the '138 patent relates in the description of the preferred embodiment that the patent uses an array "presently sold by Ferranti-Packard Limited" and describes that array, the Taylor patent was not cited to the Patent Office. Augmenting the court's understanding of the Taylor patent as prior art are the publications regarding it and its public applications and uses by Ferranti-Packard before the '138 patent was filed.

The literature widely distributed by Ferranti-Packard clarifies the capabilities of the system. The display board was available in sizes from "a standard" one line composed of ten characters, *see* Defendant's Exhibit (DX) 129, tab 11C, to sixteen lines of eighty characters or modules. *See* DX 129, tab 11D. The modules were available in character heights of 2.7 inches to 23.3 inches. Ferranti-Packard instructed that its display boards could be driven from

a typewriter keyboard, pre-programmed data on paper tape or directly from a computer. In the Ferranti-Packard standard display system, any character could be directly addressed. Any message sent to the display system consisted of two parts, an address part and a data part. Once a position had been addressed, the control unit continued to display a message beginning at that position, left to right. In order to distinguish the different parts of a message, the system used certain characters to indicate end of line and end of message. *See* DX 129, tab 11E, page 9. Ferranti-Packard specifically offered to adapt its system to fit customer requirements, *see* DX 129, tab 11, and in fact did so with regard to the dot size and drive requirements for plaintiffs. Deposition of Barry B. Hercus at 16, 33.

The advantages advertised by Ferranti-Packard are also emphasized in the Description of Prior Art section in the patent in suit as characteristic of the '138 patent:

(1) excellent visibility, even in daylight;

(2) low power consumption as power was needed only to change data;

(3) large message capacity; and

(4) sequential display.

Before 1971, Ferranti-Packard produced and installed its flip-dot system in stationary displays at the Western Airlines Terminal Building,[10] the Montreal Stock Exchange,[11] the Chicago Board of Trade,[12] the American Stock Exchange,[13] National Air-

**10.** In March 1962, Ferranti-Packard installed this flight information board in Los Angeles, California. The flip-dot character modules were programmed to display predetermined word combinations and were activated through the use of thumb wheel switches on the control unit.

**11.** In 1965, Ferranti-Packard installed a 12'6" × 12'6" visual display system for the Montreal Stock Exchange including nine display boards of Ferranti-Packard modules. The system was operated by a computer and was controlled directly from up to twenty-three input keyboards. It was arranged to display such data as bid price, preferred bidder, offered price, preferred offer and last sale price. It also displayed mes-

sages originated with or stored within the computer.

**12.** In 1967, Ferranti-Packard designed and installed a 10' × 80' visual display system for the Chicago Board of Trade using flip-dot character display modules which were approximately 4.1 inches high. The system was controlled by a computer which had a message memory storing characters in coded *ASCII* format to be presented by the display panels. The messages were written on the display board, one character at a time, column by column, beginning at the left side of each module.

**13.** In 1969, Ferranti-Packard designed and installed this visual display system using one-inch high, seven-bar, character modules. It was con-

lines,[14] and Salomon Brothers.[15] Although these systems were all stationary and quite large, Barry B. Hercus, who became Vice President and General Manager of Ferranti-Packard's electronic division in July, 1971, testified that the Ferranti-Packard flip-dots "are ... usable both for stationary and mobile applications" and that the company had always sold the same product for stationary and mobile applications. Deposition of Barry B. Hercus at 122. *See also* Deposition of C. Gordon Helwig, Supervisor of Ferranti-Packard Display Systems for twenty years, at 132–33.

Not only did Ferranti-Packard design, program and install its own display systems before the date of the Wentworth invention, but it also sold and installed its display boards and controllers to Informa-

tion Concepts Incorporated ("ICI") for incorporation in ICI's Tele-Spot sign systems. The two major visual display system installations by ICI using Ferranti-Packard flip-dots before the date of filing of the '138 patent were the Military Circle Tele-Spot Sign ("Military Circle"), in operation from January 1971 to May 1971, and the SCOPE Tele-Spot Sign ("SCOPE"), beginning operation on October 29, 1971. Both were in public use in Norfolk, Virginia. Neither was patented. The Military Circle sign contained four components: a teletypewriter; a computer with a command logic section, a memory select section and a memory bank section; a controller; and the display. The display was a set of Ferranti-Packard flip-dots, arranged in modules,

trolled by a computer in which ASCII-coded character information was stored for display.

**14.** In 1970, Ferranti-Packard designed, programmed and installed a visual display system having its flip-dot display elements at the National Airlines Terminal at JFK Airport in New York. The system had display boards consisting of sixteen lines of fifty characters per line, each character module being 2.7 inches high. Generally, the system showed airline flight information, but the boards also included two lines across the bottom which were designated for free-form messages or remarks. The system was controlled by a single computer which served a pair of controllers, one controller for each of two boards, one for arrivals and one for departures. The controllers caused the flip-dots to be set to display the characters of the message. The techniques for causing the computer to display data on the board were those utilized in the Salomon Brothers system described below. A message longer than the number of modules was presented by writing one row of display modules and overwriting the previously displayed characters by the remainder of the message.

**15.** In 1970, Ferranti-Packard designed, programmed and installed this system including a pair of message boards for displaying plain text, each of which consisted of 8 rows of 40 character modules per row. Each module comprised a 5 × 7 matrix of dots 2.7 inches high and was capable of displaying 64 different characters. The system used a keyboard to input messages to the memory of a General Automation computer which stored them for later display on the display panel. The computer supplied character data to a controller, which in turn created the electrical signals for setting the proper flip-dots to display the characters derived from the com-

puter memory. The computer and controller may be compared to the decoder of the '138 patent. The controller may be compared to the "character applying means" of the '138 patent. In this system, as each ASCII-coded character was derived from the memory, the character data was converted by the controller into electrical signals for setting the dots of the display module, one column at a time, column after column, until the entire character was displayed. The controller included a circuit with a signal that indicated that a character had been completely written. That signal controlled the application of the subsequent character to the display. This feature may be compared to the character-feedback feature of the '138 patent.

The messages were written character by character, one character after another, as the coded data was received from the computer. If the message had more characters than could be displayed in one line of display modules, a special coded signal called a "carriage return signal," stored in memory at the end of the stored message, indicated to the system that a line had been completed. The detection of the carriage-return signal caused the system to return to the beginning of the display row and it would then overwrite the following characters on the same row. In this way, the system displayed a long message as a sequence of separate segments on the same row of modules. This feature may be compared to the operation of the line feedback or wire 56 of the '138 patent. In the Salomon system, if it were desired to continue a message on the next lower display row rather than to overwrite the same display row, another coded signal called a "line feed signal" was stored in memory at the end of the stored characters for the message line. This signal caused the system to advance the display to the next display row.

each a $5 \times 7$ matrix, to display one alphanumeric character. The display had 100 modules arranged in four rows of 25 modules each, so that it was capable of displaying from one to four rows of message, each row having up to 25 letters and spaces. The teletypewriter inserted the message data into the memory bank and memory select for storage and acted as a selector to determine which messages were to be displayed, in what sequence, and for how long, in accordance with data entered by the operator. The input section served both to insert the message data to be stored into the memory bank and memory select and acted as a selector to determine which messages were to be displayed, in what sequence, and for how long, in accordance with keys pushed by the operator. The computer logic section followed the instructions given through the keyboard or stored in the computer to cause the data stored in memory to be extracted in the proper sequence of characters for the message. The computer also created address signals to determine which module of the display was to show the particular character and sent those address signals, together with character data signals, to the controller. The controller was an electronic circuit supplied by Ferranti-Packard, which processed those address and character data signals to cause the proper display module to show the particular character. The characters were displayed in sequence, one after the other. Each character was displayed by electromagnetically activating one column of display module dots at a time, column after column.

ICI sold advertising time or message display time to advertisers in blocks of minutes. Each advertiser created his own message, with as many lines as desired. After four lines of the message were displayed, the fifth and subsequent lines were displayed by changing previously displayed lines. Any previous line could be replaced by any subsequent line, as desired, after any prescribed time interval.

The keyboard operator, by direct entry or by punching a paper tape, entered the message, the date, the starting time of the intended display, and the desired duration of display into the computer. Each character stored in the computer memory was represented by ASCII-coded data, comprised of six binary bits, each bit having a 0 state or a 1 state. The pattern of states of the 6 bits uniquely represented an alphanumeric character or punctuation mark or space or control symbol. Each ASCII symbol data was stored at a particular "address" in the memory. The successive characters for each message were stored in succession, with each message line following the preceding one, until the whole message was stored, taking as much space in memory as needed. The succeeding messages were similarly stored, each immediately following the preceding one. The various messages were stored in any convenient or even random sequence. That is, the messages were stored in various sections of the computer memory with the sections having different lengths, as needed, up to a total of 120 lines, the capacity of the memory.

As each message was assigned a set start time, a separate section of the computer memory stored a "time slot table" containing the various message start times, each message start time being associated with the address in the memory of the characters making up the message to be displayed at that start time. When the pre-set start time occurred, the computer automatically "looked up" the address of the main message having that start time and displayed that message, in the manner described below. At pre-set times, lines of the message were changed, as determined by the operator.

The message data stored in the memory included a symbol at the end of each stored message line. This signal directed the system to start displaying the next row. Another symbol ("↑") was stored in memory after the fourth line, which directed that a "change" line be displayed. Following entry of all lines and line changes, and end-of-entry symbol (a sideways V, " ") was stored, to indicate completion of display of the message.

The operator, by proper keyboard entry, could cause any line to be left blank. The operator could also cancel any line. The operator, at will, could select any stored message by entering "S" followed by the start time for that message. It was then followed on the display by subsequently timed line changes or new messages, in time sequence. The sequence of messages and their successive line changes were repeated continually during the block of time set in for that message. The duration could be set by the operator to any value.

The SCOPE Tele-Spot sign varied from the Military Circle sign in two respects. It had twenty module lines rather than twenty-five and the data was stored and retrieved somewhat differently from the computer memory. In SCOPE, the message locations or addresses were identified by numbers rather than start times and a look-up table was used to locate the messages. The SCOPE system used a direct access memory that had two main libraries or tables where data was stored. The message library stored the messages; the sequence table determined the sequence in which the stored messages could be displayed.

In its regular operation, the system operated automatically once the messages and instructions were entered. The messages stored in the message library were displayed in the sequence specified by the slot sequence table. The system first examined slot number one to determine which message number was to be displayed first. If that was message number forty-three, the system went to the memory address for message number forty-three and extracted from the memory the stored characters for that message, one after the other.

The computer and controller functioned to display the message by writing the stored characters column by column, one after the other on the respective display modules to form the successive message lines on the display board in the same manner as described in the Military Circle sign. After the fourth message line of a message was displayed, the system then checked to determine whether change lines were entered. If change lines were called for, the initial displayed lines were replaced by the change lines, at the times and sequences set in. When the repeat symbol was set in, the entire sequence of initial lines and change lines was repeated.

This operation continued for a pre-set time duration. At the end of that time, the system selected the next message in sequence. To do so, the system referred to the sequence table and determined from the next sequence slot the number in memory or location of the next message to be displayed. The computer then sought out that location and caused the data corresponding to the successive characters of the second message to appear successively at the memory output. This second message was then displayed in the same way as the first message was displayed. The system proceeded, slot after slot, to display the successive messages whose numbers were stored in the respective slots, until as many messages had been displayed as corresponded to the slot numbers which had been set into the system by the operator. At the end of this cycle, the system returned to the message listed in slot number one and repeated the entire cycle. The system could also display any desired message out of sequence.

The system had means to display one message line at a time, to replace that line by a second message line, and then by a third message line, and then to recycle through the first, second and third message lines repeatedly. On the other hand, any message could take the form of a single line, with successive change lines, displayed in sequence cyclically.

 Plaintiffs, citing *Continental Oil Co. v. Cole*, 634 F.2d 188, 195–96 (5th Cir.), *cert. denied*, 454 U.S. 830, 102 S.Ct. 124, 70 L.Ed.2d 106 (1981), maintain that the Military Circle and SCOPE signs were "secret uses" of an invention and thus do not constitute prior art. In *Continental Oil*, the court determined that a private intracorporate communication which described the proposed patent's rotatability

features and was privately directed to the patent department could not be considered prior art. In this case, the manual describing the operation of the Tele-Spot systems was made available to employees and operators. In considering prior "public use" under 35 U.S.C. § 102(b), courts have determined that information is public if made *freely available* within a company. *See, e.g., Rosaire v. Baroid Sales Division, National Lead Co.,* 218 F.2d 72 (5th Cir.1955) (citing *Corona Cord Tire Co. v. Donovan Chemical Corp.,* 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928) (emphasis added). That conclusion appears justified also in an analysis under 35 U.S.C. § 103. *See Sutter Products Co. v. Pettibone Mulliken Corp.,* 428 F.2d 639, 646 (7th Cir.1970) ("prior art" under section 103 includes all material, i.e. public uses, considered to determine novelty under section 102). *See also Kardulas v. Florida Machine Products Co.,* 438 F.2d 1118, 1120 (5th Cir.1971). A further indication that the operation of the Tele-Spot signs was not "secret" is the fact that the programming for the systems was sent to Ferranti-Packard when it did the testing for the signs. *See* Deposition of Neil Armann at 192. More important, the signs were in actual commercial use in Norfolk. Whether plaintiffs had actual knowledge of the method of operation of the signs is not determinative. *See Sutter Products Co. v. Pettibone Mulliken Corp.,* 428 F.2d 639, 645 (7th Cir.1970). *See also Cali v. Eastern Airlines, Inc.,* 442 F.2d 65, 68 (2d Cir.1971), ("It is a matter of legal indifference that the 'public' use may be necessarily concealed from public awareness by the structure of the design or the manner of its use...."). *Cf. Palmer v. Dudzik,* 481 F.2d 1377 (C.C.P.A.1973) (use of invention within company with intent not to disclose it supports conclusion that appellant concealed the invention for purposes of section 102(g)). The public exhibition of Military Circle and SCOPE was not a secret use of the invention, and both Tele-Spot signs constitute prior art.

As discussed previously, a consideration of prior art includes pertinent prior patents and the inferences to be drawn from those patents in light of prior uses and publications. Both defendant and plaintiffs offered evidence of prior patents. Plaintiffs introduced five prior patents, describing vehicular display systems, only the first of which had been brought to the attention of the Patent Office: Newman, No. 3,226,707; Hall, No. 3,512,288; Jay, No. 3,514,885; Elledge, No. 3,622,980; Fields, No. 3,631,454. Plaintiffs emphasize that none of these systems used a computer-operated electronic display system. Rather, the displays were of the curtain, tape, or panel type, some using lamps, some power-driven. The court agrees that the failure to cite these patents does not affect the presumption of validity attaching to the '138 patent. On the other hand, the failure to cite the Tele-Spot signs as well as the following patents does weaken the presumption.

Defendant stressed the Taylor patent, No. 3,303,494, which has been described. It teaches the advantages of the electronic display unit used in the patent. For example, the display economizes power. The defendant also emphasized other patents, all of which seem pertinent to this court because they involve message display systems. Two patents, Fox and Schanne, are audible rather than visual message systems but are in an analogous field familiar to someone skilled in electronics. *See* page 527 *infra.*

> If the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then such arts must be said to be analogous.

*Stearns v. Tinker & Rasor,* 220 F.2d 49, 56–57 (9th Cir.), *cert. denied,* 350 U.S. 830, 76 S.Ct. 62, 100 L.Ed. 741 (1955), *cited in Technology Corp. v. Research-Cottrell, Inc.,* 641 F.2d 298 (5th Cir.1981).

U.S. Patent No. 3,292,154 to E.C. Simmons describes a system for converting stored electrical signals representing information to characters on a visual display. The system records individual characters

on a magnetic memory to form a "dictionary." It selects individual ones of these characters in a desired sequence to compose a message and then displays the message on a visual display. It teaches the general concept of the memory select feature of the patent.

U.S. Patent No. 3,296,391 to F.L. Fox describes a system for storing separate message segments and producing any desired one of a larger number of messages by selecting certain ones of those segments and combining them in a desired order. The message segments are stored in separate sections of a magnetic memory, which is pre-programmed and serves thereafter as a read-only memory. The system also stores sets of coded signals, each set representing a desired assemblage of message segments. To select a desired message, the corresponding set of coded signals is read out of storage and causes the required message segments to be read out of the magnetic memory, one after the other, to form the desired message. This prior art patent teaches the concept of storing message segments ("word units") in respective memory sections ("locations"), and using a "memory select" to activate specified locations in desired sequence to form a message through use of a "look-up" table.

U.S. Patent No. 3,384,888 to J.D. Harnden discloses a visual display system in which the display consists of a panel having a number of display elements or lamps arranged in seven rows and many columns, capable of displaying sixteen characters in one row, with each character displayed by a $5 \times 7$ matrix of dots. The messages to be displayed are stored on a tape or magnetic core storage. While primarily described in terms of a travelling-character sign in which the characters are continually inserted at the right and travel along the panel to the left, it specifically states that it may be utilized as a changing sign, in which the characters do not move, but are fixed in position though changeable as in time/temperature signs and scoreboards. In one form, the system activates the entire row of display elements while the lamps are kept dark. After all characters

have been set, the movement of characters is stopped, and the lamps are made bright, thus making the entire message appear at once. This procedure is accomplished by an end-of-line signal in a decoder, which initiates the next line after a fixed pause. This patent thus teaches the concept of "writing over," that is, displaying one message portion or line and then succeeding it with a changed line. It also teaches the use of an end-of-line signal to initiate the next message line.

U.S. Patent No. 3,575,555 to J.F. Schanne teaches that in a message selecting system, storage requirements can be reduced by storing message segments, *e.g.* words or phrases, and causing them to be assembled in desired combinations and sequences to form desired messages. It goes further to teach additional economy of storage capacity by storing smaller message segments, or phonemes, instead of words. The specific message segments illustrated as phonemes are stored in binary code; each in a separate location (track) stored serially in the memory bank (magnetic storage drum) of a pre-programmed read-only core memory. Each location is assigned three numbers, serving to permit selecting the particular phoneme. A selector such as a computer selects the particular locations to be activated in sequence to produce the desired full message. This feature teaches the concept of the memory select feature. This Schanne system stores the selected message segments in sequence and then causes them to produce the message audibly. Characters or word units could similarly be stored instead of phonemes, and visual display readily used in place of the sound reproduction.

U.S. Patent No. 3,611,347 to C.E.L. Gingell discloses a time/temperature sign as often seen outside banks. It also suggests that the time and a message may be alternated. It is a discrete-logic digital control system, as is the patent in suit.

U.S. Patent No. 3,594,778 to Herald was cited by the Patent Office as the basis for holding the original '138 patent claims un-

patentable. The amendments presented and argued as providing patentable distinctions over Herald will be discussed below.[16] The Herald patent discloses a visual display system for use particularly as a message board and scoreboard in a stadium. The system includes a display board capable of displaying a limited number of characters, usually in a plurality of rows. The individual characters appear on modules, each being a $5 \times 7$ matrix of display elements. While the illustrative example described has light bulbs for the display elements, this patent clearly teaches the use of reflective discs such as in the Ferranti-Packard flip-dot displays. *See* col. 7, lines 4–7. In this system, predefined messages are stored in ASCII binary code in particular locations in a pre-programmed core memory, used as a read only memory and are called out by a keyboard selector for display when desired. In Herald, the characters are written one after the other, and each character is written one column of dots after another. If a message is longer than can be displayed in one row of display modules, a signal called a "jam" signal indicates that a row has been fully displayed and causes the system to address the first module of the next row. This signal is a feedback signal to initiate the next message line. The Herald system also includes an end-of-message signal when the end of the display is reached.

Defendant also emphasizes a publication as part of the prior art to be considered: Borden & Kniss, "Strobing Makes Longer LED Alphanumeric Displays Practical," *Electronics Magazine*, March 2, 1970, pp. 126–130. This article describes an electronic programmable visual display system adapted to display alphanumeric characters. The display system includes three basic components: a manual control unit (the keyboard), decoder circuitry and a display unit.

The display unit is made up of a panel having a limited number of display modules, each of which consists of a $5 \times 7$ matrix of 35 dots capable of displaying any alphanumeric character by energizing appropriate dots. While illustratively described in terms of three modules, the article makes clear that its principles are applicable to larger numbers.

The display unit uses light-emitting diodes as the dots rather than Ferranti dots. However, as noted below, the patented subject matter is directed broadly to any form of visual display having the requisite modules. The keyboard described in the article provides a sequence of ASCII-coded signals, representing successive characters to be displayed. The article makes clear that other forms of data entry would be applicable. The system will accept a sequence of coded character signals from any source. For example, data derived from the composing matrix of the prior art Fox patent, or the display track of the prior art Schanne patent, could be supplied. This sequence of coded character signals is supplied to the decoder memory, composed of a set of "storage registers," one for each character. These could be described as "memory locations." This memory is a pre-programmed directly addressed read only memory.

The article then describes how the characters stored in that memory are displayed on the display unit, by the remainder of the decoder, "character applying means." This is done in sequence, one character after the other, by the action of "steering counter 2." Each character is displayed one column at a time, column after column, under control of "steering counter 4," actuated from the clock.

After the fifth column of each character is activated, the decoder sends back a signal from the "column select" to steering counter 2 to direct that counter to supply the next character as does the '138 patent

**16.** Plaintiffs argue that the Herald patent cited to the Patent Office presented all relevant characteristics of the Military Circle and SCOPE signs as prior art. *See* Plaintiffs' Proposed Findings of Fact at 58–59. Herald is in many respects similar but of critical importance is the fact that the Tele-Spot signs have the characteristics corresponding to the amendments of the '138 patent filed to distinguish the patent over Herald. *See* pages 526 & 529 *infra*.

character feedback wire 54. Therefore, the disclosed structure for processing the characters as they come sequentially from the memory to activate the corresponding display modules has a character feedback means.

### B. *The Differences Between the Prior Art and the Claims of the '138 Patent*

The second factual inquiry suggested by the Supreme Court in *Graham* is a determination of the differences between the prior art and the *claims* at issue. One difference, considered critical by the plaintiffs at trial, is the vehicular application of the '138 display system. Yet the claims of the patent in suit do not limit the display to a mobile system, a fact conceded by plaintiffs' expert.[17] *See* Transcript at 598. In fact, the patent application was first rejected as anticipated by the Herald patent mentioned above, itself a large stationary display system, so the Patent Office apparently did not believe the mobile use to be a critical distinction.[18] The amended claims do not limit the system to mobile applica-

tion, so plaintiffs' attempt to ground the patent's uniqueness on that basis fails.[19] *See Bendix Corp. v. U.S.*, 600 F.2d 1364, 1384, 220 Ct.Cl. 507 (1979) (when differences between prior art and patent do not appear in claims, they cannot be considered in determining validity.)

Following are the allegedly infringed claims of the '138 patent, with claim one underlined to show the limitations added to it by amendment to escape the encompassing net of the prior art Herald patent:

We claim:

1. A visual display system comprising: *display means including a limited number of display elements, one element for each character of a word;* 'means for selecting any one of a plurality of messages *for display by said display means, at least some* of said messages consisting of two or more word units, *each of said word units consisting of a number of characters and spaces before, between, and after characters equal to the number of display elements in said display*

---

17. At trial, Dr. Cochran testified:

Q. (Mr. Relson, defendant's attorney): I want to refer again to the patent claims.... Are the patent claims limited to mobile signs?
A. (Dr. Cochran, plaintiffs' expert): No sir.
Q. Are they broad enough to cover stationary signs as well?
A. Yes, sir.
Q. Are they limited to any size of display?
A. No, sir.
Q. Are they limited to any number of display modules?
A. By inference.
Q. And what is that limit?
A. It's the point you [can't] have it infinite, so it has to be finite.
Q. Apart from being finite, it could be as small or large as practical?
A. That's correct.
Q. Is the patent—I should say are the patent claims limited to having the display modules in a single row?
A. No, sir.
Q. The word unit could extend over several rows; is that right?
A. Yes, sir.

18. Comparing the large sign made by the Wentworth Corporation for Anaheim Stadium to the '138 Patent, Wentworth concluded: "It was basically the use of larger twelve inch charac-

ters [that] required us to modify our drives because it required more current, but basically it was the same darn thing." Deposition of Richard Wentworth at 80. Wentworth apparently recognized that size was not critical to the application of his system.

Neil Armann, employed by ICI from 1967–1973, concluded that no change in programming or circuitry in the standard Ferranti-Packard system was necessary to reduce character size, to reduce the number of characters per line or to reduce the number of lines in the display. Deposition of Neil Armann at 177–78.

19. Though the amendments do not limit the claims to mobile application, Mr. Jekiell's notes compiled after reviewing the Patent Office rejection suggest that application to be the "basic claim" of "invention":

It is not the intention of this patent to claim the method in which the logic/circuitry is mechanized to control and route data in the visual display system. Techniques used to control any 5 × 7 character displays are quite common and are evident in all the referenced patents reviewed.
The basic claim of the patent is to reveal implementation of key components into a system such that a visual display can feasibly be used on stationary or moving vehicles.

*See* Plaintiff's Exhibit 148.

*means, said display means being only capable of displaying one word unit at a time whereby said display means displays the word units of the selected message sequentially;*

*a directly addressable, pre-programmed read-only* memory means including a plurality of memory locations, each of said memory locations storing *the characters of* one of said word units;

logic means interposed between said selecting means and said memory means for activating individual ones of said memory locations in accordance with selected message, *each of* said memory locations being operative, upon activation, to *sequentially* apply to the output thereof *the characters of* the word unit stored therein; and

*means interposed between said output of said memory means and said display means for sequentially applying the characters of said word units to said display means, said characters applying means being operative, upon completion of the application of each character to said display means, to signal said memory means to apply to the output thereof the next character of the word unit stored therein,*

*said memory means including feedback means being operative, upon completion of the application to said display means of the last character of each word unit, to generate a feedback signal to activate the next memory location to apply the characters of the word unit stored therein to the output thereof in accordance with said selected message.*

\* \* \* \* \* \*

6. A visual display system according to claim 1 wherein said feedback means is further operative, upon completion of the application to said display means of the last character of the last word unit of said selected message, to generate a

second feedback signal and to apply said second feedback signal to said logic means to signal the completion of the display of said selected message.

\* \* \* \* \* \*

8. A visual display system according to ·claim 1 wherein each of said display elements comprises a plurality of rows and columns of display units, each of said display units being selectively visible without the application of electrical power thereto, each of said display units only requiring power to change the state thereof.

9. A visual display system according to claim 8 wherein each of said display units consists of an indicator dot and an electro-magnetic drive assembly, each of said dots consisting of a thin, flat disc having a visible side and an invisible side and being rotatable to expose one side or the other, and wherein said electro-magnetic drive assembly maintains said disc with one side or the other exposed without the application of power thereto, whereby said selected message may be maintained with no power applied to said display system.

\* \* \* \* \* \*

In summary, when the '138 patent was first rejected by the Patent Office on the basis of the Herald patent, the applicants added these limitations to their claims: (1) sequential activation of memory locations for sequential application of word units to a display,[20] (2) the end-of-line feedback means, wire 56 in figure 2, (3) the directly addressed memory, (4) the read only memory, (5) the end of character feedback means, wire 54 in figure 2, (6) the end of message feedback signal, (7) the storage of individual word units and (8) a unique display. They argued that these elements distinguished the '138 claims over Herald, *see* DX 6. As *Parker v. Motorola, Inc.,* 524 F.2d 518 (5th Cir.1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976), noted, the elements added in an

**20.** Patent Claim 1 does not limit the '138 patent to one-line displays. The patent disclosure also

suggests it could cover a multiline sign. *See* col. 5, lines 60–65. *See also* note 17 *supra.*

amendment and argued as distinguishable over prior art references determine the "relevant prior art on which the "determination of obviousness depends." 524 F.2d at 518. That is, if the prior art cited as evidence by defendant includes or implies these main elements in a display system or systems, the court is more easily led to a conclusion of obviousness. Before making a conclusion on this issue, the court must address the third factual inquiry demanded by *Graham.*

## C. *The Level of Ordinary Skill in the Pertinent Art*

 The defendant's expert witness, Dr. Thomas Rhyne, characterized the field of technology with which this system is concerned as digital systems engineering. Both plaintiffs' and defendant's expert witnesses agreed that the person of ordinary skill in the art would possess a B.A. or M.A. in engineering, with a focus on electronics and digital systems, but Dr. Cochran, the plaintiffs' witness, stressed that in 1971 the typical engineer with such qualifications did not know about computers. Yet, Dr. Cochran acknowledged that an electronics engineer would be quite familiar with *Electronics* magazine which on March 2, 1970 described the use of a pre-programmed read only memory in a visual display system, *see* DX 129 and page 522 *supra,* and in May, 1970, described a read only memory as field programmable.[21] Prior art in analogous fields is pertinent to obviousness. *John Zink Co. v. National Airoil Burner Co.,* 613 F.2d 547, 551 (5th Cir.1980). Thus, the ordinarily skilled electronics engineer should have been aware of the pre-programmed read only memory in 1971. The key then is not whether the individual components of the '138 patent were obvious[22] but whether "the subject matter as a whole would have been obvious to a person having ordinary skill in the art," 35 U.S.C. § 103, or "whether the aggregation produced a new or different

result or achieved a synergistic result." *Continental Oil v. Cole,* 634 F.2d 188 (5th Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 124, 70 L.Ed.2d 106 (1981). The courts, in making such a distinction, focus on the difference between mechanical skill and creative skill. *See, e.g., Parker v. Motorola, Inc.,* 524 F.2d 518 (5th Cir.1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976).

## IV. *Conclusion*

 Would the use of the directly addressable pre-programmed read only memory in a visual display system using a Ferranti-Packard flip-dot display board coupled with end-of-character, end-of-line and end-of-message feedback signals have been obvious in 1971? As mentioned above, if a patent has been rejected on the basis of prior art, a court determining the obviousness of that patent should focus on the manner in which the applicant distinguished the patent from the prior art cited, in this case the Herald patent, and decide whether other relevant prior art not revealed to the Patent Office discloses those alleged distinctions. *Parker v. Motorola,* 524 F.2d 518, 533 (5th Cir.1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976). The distinctions argued by the applicants are: (1) sequential activation of memory locations for sequential application of word units to a display (2) a directly addressable pre-programmed read only memory (3) feedback means at the end of each character (4) feedback means at the end of each line (5) feedback means at the end of the message (6) storage of individual word units at memory locations within the memory means (7) a display unit consisting of an indicator dot and an electromagnetic drive assembly whereby power is required only to change the state of the display units.

---

**21.** Dr. Cochran also noted that the inventors of the '138 patent were not computer experts. Trial Transcript of Dr. Gary Cochran at 321.

**22.** The language of the patent reveals the commonness of its components: "conventional logic circuitry"; a memory device which is a "simple pre-programmed assembly"; a "standard off-the-shelf" character generator.

The advertising literature distributed by Ferranti-Packard disclosed the possibility of a computer-activated one-line display with end of character and end of message signals.[23] Ferranti-Packard literature also disclosed the use of directly addressed memory locations. The Fox, Schanne, and Simmons patents are pre-programmed to operate as read only memories. Neither they nor the systems designed by Ferranti-Packard use a PROM,[24] but a pre-programmed read only memory in a display system is taught by the March 2, 1970 *Electronics* article. The March 2, 1970 *Electronics* article suggested the end of character signal. The Salomon Brothers system designed and installed by Ferranti-Packard used the end of line feedback signal. *See* note 12 *supra*. The Fox patent teaches the concept of storing word segments in memory locations to be activated by a memory select and displayed in sequence. The Simmons patent has sequentially addressed memory locations. The display means is disclosed by the Ferranti-Packard Taylor patent. Thus, even without considering the Tele-Spot signs, the prior art discloses the features considered "distinct" by the applicants. It would have been obvious to selectively compose and assemble separately stored word units, taught by Fox or Schanne, and to display such word units by the character applying means and display means of the *Electronics* article on the display board taught by the Taylor patent.[25]

As the Tele-Spot signs were in public use, their existence gives additional support to the conclusion that the combination of the '138 patent is obvious. The Military Circle and SCOPE signs had a decoder which included logic means for determining and controlling the operation of the system. Both had a memory bank for storing a number of messages in a directly addressable manner. They had random access memories, but once the messages were stored, the system operated on a "read-only" basis.[26] The Tele-Spot systems stored each message in memory with its own address. The time-slot table in the Military Circle sign corresponds to the "memory select" of the patent. The SCOPE sign had a slot-sequence table which stored the addresses of the messages and designated which to display next. The Tele-Spot systems directly accessed the message to be displayed, and the characters of the stored message were

23. In a colloquy with the court, the plaintiffs' expert witness acknowledged that if Ferranti-Packard Ltd. wished to make full use of its Taylor patent, such use would include the '138 patent:

The Court: I guess one thing that goes through my mind would be [what] if Ferranti-Packard decided to use the patent on that system.

Mr. Relson: (defendant's attorney). On the display, both parties buy their goods from Ferranti-Packard, so the Ferranti-Packard patent doesn't enter into this.

The Court: I understand. The question I['m] deal[ing] with is if Ferranti-Packard decided, itself, to make full use of that patent.

The Witness: (plaintiffs' expert, Dr. Cochran). I agree. That's their choice.

. . . .

I will say if Ferranti-Packard chose to exercise the rights of their patent, I think a lot of people would be doing a tremendous amount of work on liquid crystals.

24. A PROM is a semiconductor memory. Messages preprogrammed in the memory can be displayed but cannot be reprogrammed.

25. Plaintiffs attempt to distinguish this prior art on the basis that each patent does not have all of the characteristics of the '138 patent is unsuccessful. Invalidity can arise from the obvious combination of prior art.

26. Post-trial evidence submitted by defendant demonstrates that plaintiff Vultron, in an amendment and argument concerning its application for a patent, referred to the '138 patent in suit as having a random access memory. This reference places in question plaintiffs' position that the Tele-Spot signs with random access memories are distinguishable from the '138 patent with a read only memory. Plaintiffs argue that the term "random access" refers to attributes of both RAM and ROM memories, that is, both memories are "randomly accessible." The remaining difference is that the Military Circle memory can be "written" as well as read whereas the '138 patent cannot. Plaintiffs' expert testified, however, that removing the capability to change messages, i.e. the capability of writing, is not innovative. *See* Transcript at 522. Therefore, the Tele-Spot memories and the '138 patent memory are essentially the same.

output one by one. Both systems had a means for applying the data representing characters from the memory bank to a display, the means including converting the data into signals for activating the display, one column at a time for each character. The sign systems had a Ferranti-Packard flip-dot display. Both systems had means for displaying a message longer than the display capacity, by displaying segments of the message in sequence and for repeatedly displaying the sequence of displayed lines. In both systems, the next character was not displayed until the previous character had been completed. Both systems had an extra bit stored in memory to instruct the system to display the next line. In the SCOPE sign, a signal stored in memory at the end of the full message caused the entire message to be repeated. The Tele-Spot systems have each of the features considered to make the '138 patent distinct from the Herald patent except the storage of individual word units. A person ordinarily skilled in the art could have inferred such a dictionary storage from the knowledge of the prior art Tele-Spot signs. These prior public uses make the '138 patent an obvious assemblage of available parts.

Plaintiffs argue that 3M, ICI, Gulton Industries, and Vultron/Transign experimented concurrently with the '138 "invention" and did not discover this combination. The failure of others is a "secondary consideration" in determining obviousness, see *John Zink Co. v. National Airoil Burner Co.*, 613 F.2d 547, 551 (5th Cir. 1980), and should be addressed by the court. Robert Fritts, Project Manager of the Graphic Technologies Group at 3M, designed the Varicom Mobile Sign patented in 1969. His deposition testimony reveals that he was aware of the Ferranti-Packard display but chose a scroll means. He explained, however, that the choice was one of economy. "The components of our stationary sign could not be used with another type of display. That dictated the use of the display mechanism." Deposition of Robert Fritts at 39. Thus, the design of the VARICOM sign was chosen to incorporate the display medium of retroreflective display panels manufactured by 3M.

In 1966, ICI designed and built a mobile computer-activated sports-scoring and information display system which was utilized at golf tournaments. This IBM trailer system had a display board on the side of a truck. An ICI computer was situated within the truck to control the messages appearing on the sign. The purpose of the display was to name the tournament participants and scores, as well as their locations on the golf course. It utilized lightbulb technology for the display.

In 1968 or 1969, ICI built a mobile sign for the Xerox Corporation which was carried on a truck and controlled by a computer situated within the truck. The concept involved driving the truck to sports events and elevating the sign from the truck high enough so that it could be observed by people within the stadium. The system had a memory in the form of a disc storage for storing messages as well as a direct-access memory in the computer. The system could select one message from a group of messages stored, and display the selected message. The display utilized lightbulb technology; messages were written by activating either one lightbulb or a limited group of lightbulbs but not all lightbulbs at a time, rapidly enough so that the message appeared to be instantaneously displayed on the sign.

Other than these two experimental mobile display systems, ICI, according to John Mauro, an employee of ICI from 1965 to the present, had no interest in mobile display signs for police cars or other vehicles and only designed a mobile sign for army recruiting, so they were not actively seeking an improved design. Deposition of John Mauro at 39.

Gulton Industries was seriously seeking a display other than liquid crystal to be used in mobile systems. Even after commissioning a study of display devices, see DX 94, Gulton remained unaware of the Ferranti-Packard system. In 1975, when the company learned of the flip-dots,

it immediately designed the Luminator System. Thus, once Gulton learned of the flip-dot technology, they developed a system with relative ease. Vultron/Transign had a similar experience. Both examples suggest only routine engineering was necessary to develop a flip-dot bus display system.[27]

 The experiences of these companies do not negate the obviousness of plaintiffs' combination patent. Richard Jekiell, the inventor, characterized the essential features of novelty of the patent as (1) the mobile application (2) the low power (3) the portability and (4) the way the system was interconnected and utilized. Deposition of Richard Jekiell at 85. As discussed, the claims of the patent are not limited to a mobile, portable application. Even if they were, such would be a natural evolution of the Ferranti-Packard system. The low power is also a characteristic of the Ferranti-Packard display. Given the prior art patents, publications and uses, the court finds that the "way the system was interconnected and utilized" is obvious. The elements do not cooperate in such a manner as to produce a new, unobvious and unexpected result. *Walker on Patents*, § 110, p. 222 (Deller's 2d ed.). Richard Jekiell, with several years experience at Rockwell, received his B.A. approximately two years before filing for the patent. Although his experience arguably raises him above the level of the engineer with ordinary skill, he responded, when questioned whether the patented display system resulted from or related to any research or development or experimental work at Rockwell: "None whatsoever. I was rather naive in display systems and character generation at that point in time." Deposition of Richard Jekiell at 75. His response gives further support to the court's conclusion that only ordinary mechanical skill was required to build the '138 system.[28]

The parties will submit a proposed form of judgment consistent with this opinion.

---

27. Two other "secondary considerations" in determining the obviousness of a patent are (1) its commercial success (2) its solution to a long-felt need. In this case, Mr. Wentworth, the record owner of the '138 patent, never had success in marketing a product that embodied the claimed subject matter of the patent in suit. Nor has there been any proof that the sales of the Gulton and Transign systems can be attributed to the claimed invention of the patent in suit. This lack of commercial success in marketing also negates the argument that the '138 patent solved a long-felt need.

28. Because the court decides that the patent is invalid as an obvious combination of prior art, it does not consider the infringement issue. *See Beckman Instruments v. Chemtronics*, 428 F.2d 555, 558 n. 4 (5th Cir.1970) ("infringement considered only if validity is decided favorably to the patentee"); *see also Parker v. Motorola, Inc.*, 524 F.2d 518, 529 (5th Cir.1975). The court also does not reach defendant's inadequate disclosure argument.